# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| MICHELLE DENISE SWANSON, | ) |
| Plaintiff, | ) |
| vs. | )   CV 12-J-2694-S |
| CAROLYN W. COLVIN, Commissioner, Social Security Administration, | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

This matter is before the court on the record and the briefs of the parties. This court has jurisdiction pursuant to 42 U.S.C. § 405. Plaintiff is seeking reversal or remand of a final decision of the Commissioner. All administrative remedies have been exhausted.

### Procedural Background

Michelle Denise Swanson (plaintiff) filed an application for disability insurance benefits under Title II of the Social Security Act on December 12, 2008 (R. 71, 128-131), and an application for Supplemental Security Income benefits under Title XVI of the Social Security Act on December 12, 2008 (R. 72, 125-127). These applications were denied initially by the State Agency, and plaintiff requested a hearing before an Administrative Law Judge (ALJ) on April 6, 2009. (R. 75-76). A hearing was held on behalf of plaintiff on May 21, 2010. (R. 31-63).

The ALJ denied disability benefits to Plaintiff on June 18, 2010, concluding

that plaintiff did not have an impairment or a combination of impairments listed in, or medically equal to one listed in, the Regulations. (R. 22-27). The ALJ found that plaintiff retained the residual functional capacity to perform work-related activities at the sedentary level of physical exertion, and that there would be jobs in the national economy that would accommodate plaintiff's limitations. (R. 24-27).

This became the final decision of the Commissioner of the Social Security Administration (Commissioner) when the Appeals Council declined to grant review of the ALJ's decision by form denial on June 12, 2012. (R. 1-3). Having exhausted all administrative remedies, plaintiff filed this action for judicial review in Federal Court pursuant to §205(g) and §1631(c)(3) of the Social Security Act, 42 U.S.C. §405(g) and §1383(c)(3).

## Factual Background

Plaintiff was 45 years of age at the time of her hearing and has a tenth grade education. (R. 26, 48). At 45 years of age, plaintiff is considered a "younger person" according to 20 C.F.R. §§404.1563(c) and 416.963(c). Plaintiff's past relevant work experience is as a retail cashier/stocker/store keeper. (R. 39). Plaintiff alleges an inability to engage in substantial gainful activity since December10, 2008, due to symptoms and limitations related to a torn foot ligament with multiple surgeries; depression; and chronic and severe pain. (R. 157).

Plaintiff testified that she is unable to work due to the effects of a torn Achilles heel. (R. 40). She has currently had five surgeries in attempts to correct the tear. Her surgeon is Dr. Floyd at Cooper Green Mercy Hospital. (R. 40). Dr. Floyd has informed her that she will be required to have yet another surgery. (R. 41). She also has significant difficulty with depression and anxiety and she stays stressed and cries for no reason. (R. 42). She also has panic attacks and has periods when she forgets things (R. 42).

Plaintiff testified that due to her ankle and heel impairments, she would only be able to stand for fifteen minutes. (R. 43). She testified to chronic pain and a need to lie down frequently during the day. (R. 46). She rated her average pain as an eight on a ten-point pain scale. (R. 47). She must elevate her leg during the day and spends the day lying in her bed with her feet propped on pillows. (R. 48).

The medical evidence of record documents that plaintiff has post electrocution leg injuries with prostheses.[1] (R. 238). She is status post multiple ankle surgeries. (R. 284-293). One of her operative reports indicates her Achilles tendon was "remarkably scarred with skin down to the level of the tendon itself." (R. 287). She has diabetes

---

[1]The record does not reflect how, when, or if plaintiff was electrocuted. Nor does the record reflect that plaintiff uses a "prostheses." The record does show that plaintiff has a chronic torn Achilles tendon on her left foot. (R. 213). This has resulted in multiple surgeries including a flexor hallucis longus transfer (FHL). (R. 284). The FHL transfer consists of taking the flexor hallucis tendon to graft on to the Achilles tendon. *See* http://www.ncbi.nlm.nih.gov/pubmed/12793486 (Last visited April 12, 2013).

mellitus uncontrolled, a chronic left Achilles tendon tear, depression, anxiety, chronic migraine headaches, hypertension, and obesity. (R. 202-212, 230-231, 293, 297-298, 301-305). She also occasionally has auditory hallucinations and has residual effects from a head injury sustained in a diving accident in a swimming pool. (R. 227-231).

As of March 12, 2009, plaintiff's prescription medications included Depakote[2] (Valporic acid) 250 mg twice a day; Metoprolol[3] 100 mg twice a day for high blood pressure; Diltiazem[4] 60 mg twice a day for high blood pressure; Klor-Con[5] (potassium) 10 mEq daily; NitroQuick[6] (nitroglycerin) 0.4 mg three times daily;

---

[2] "[U]sed alone or together with other medicines to control certain types of seizures (convulsions) in the treatment of epilepsy. This medicine is an anticonvulsant that works in the brain tissue to stop seizures. Valproic acid is also used to treat the manic phase of bipolar disorder (manic-depressive illness), and helps prevent migraine headaches." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012594/?report=details#how_to_use (Last accessed 4/1/2013).

[3] "Metoprolol is used alone or in combination with other medications to treat high blood pressure. It also is used to prevent angina (chest pain) and to improve survival after a heart attack. Extended-release (long-acting) metoprolol also is used in combination with other medications to treat heart failure. Metoprolol is in a class of medications called beta blockers. It works by relaxing blood vessels and slowing heart rate to improve blood flow and decrease blood pressure." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682864.html (Last accessed 4/1/2013).

[4] "Diltiazem is used to treat high blood pressure and to control angina (chest pain). Diltiazem is in a class of medications called calcium-channel blockers. It works by relaxing the blood vessels so the heart does not have to pump as hard. It also increases the supply of blood and oxygen to the heart." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684027.html (Last accessed 4/1/2013).

[5] "Klor-Con (potassium) is essential for the proper functioning of the heart, kidneys, muscles, nerves, and digestive system." http://www.rxresource.org/consumer-information/klor-con.html (Last accessed 4/1/2013).

[6] "[A]n antianginal, antihypertensive, and vasodilator used for the prophylaxis and treatment of angina pectoris, the treatment of congestive heart failure and myocardial infarction, and blood pressure control or controlled hypotension during surgery." http://medical-dictionary.thefreedictionary.com/Nitroquick (Last accessed 4/1/2013).

Amitriptyline[7] 25 mg daily for depression; Pravastatin[8] 40 mg daily; Hydrochlorothiazide[9] 25 mg daily; Trazodone[10] 50 mg daily for insomnia; Citalopram[11] 20 mg daily for depression; Buspirone[12] 10 mg twice a day; and Lantus[13] (Insulin glargine) 50 units subcutaneous twice a day, however, she only takes it once daily due to her inability to pay for the medication. (R. 284).

---

[7]"Amitriptyline is used to treat symptoms of depression. Amitriptyline is in a class of medications called tricyclic antidepressants. It works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.html (Last accessed 4/1/2013).

[8]"Pravastatin is used with diet, weight-loss, and exercise to reduce the risk of heart attack and stroke and to decrease the chance that heart surgery will be needed in people who have heart disease or who are at risk of developing heart disease. Pravastatin is also used to reduce the amount of cholesterol (a fat-like substance) and other fatty substances in the blood." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692025.html (Last accessed 4/1/2013).

[9]"Hydrochlorothiazide, a 'water pill,' is used to treat high blood pressure and fluid retention caused by various conditions, including heart disease. It causes the kidneys to get rid of unneeded water and salt from the body into the urine." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (Last accessed 4/1/2013).

[10]"Trazodone is used to treat depression. Trazodone is in a class of medications called serotonin modulators. It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (Last accessed 4/1/2013).

[11]"Citalopram is used to treat depression. Citalopram is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs). It is thought to work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (Last accessed 4/1/2013).

[12]"Buspirone is used to treat anxiety disorders or in the short-term treatment of symptoms of anxiety." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688005.html (Last accessed 4/1/2013).

[13]"Insulin glargine is used to treat type 1 diabetes (condition in which the body does not produce insulin and therefore cannot control the amount of sugar in the blood). It is also used to treat people with type 2 diabetes (condition in which the body does not use insulin normally and, therefore, cannot control the amount of sugar in the blood) who need insulin to control their diabetes. In patients with type 1 diabetes, insulin glargine must be used with another type of insulin (a short-acting insulin). In patients with type 2 diabetes, insulin glargine also may be used with another type of insulin or with oral medication(s) for diabetes. Insulin glargine is a long-acting, man-made version of human insulin. Insulin glargine works by replacing the insulin that is normally produced by the body and by helping move sugar from the blood into other body tissues where it is used for energy. It also stops the liver from producing more sugar." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a600027.html (Last accessed 4/1/2013).

On March 5, 2009, DDS sent plaintiff to Dr. Amena Hasan for a consultative examination. (R. 235-238). Dr. Hasan stated that plaintiff was unable to perform tandem gait, toe walk or heel walk, and the diagnoses included post electrocution leg injuries with prostheses. (R. 237-238). Dr. Hasan stated that plaintiff could stand and walk for a total of less than 1 hour and could sit for between 6 to 8 hours and could lift 10 to 20 pounds. (R. 238). Dr. Hasan said that plaintiff had to be careful while kneeling and balancing. (*Id.*)

Dr. James G. Floyd, the orthopedic surgeon who performed plaintiff's ankle surgeries including debridement of wounds, completed a Physical Capacities Evaluation (PCE) and a Clinical Assessment of Pain (pain form) on January 6, 2010. (R. 265-267). Dr. Floyd noted that plaintiff could sit for a total of 3 hours during an entire 8 hour day and could stand and walk combined for a total of 1 hour in an 8 hour day and used a cane. (R. 265). Dr. Floyd found that plaintiff could never perform push/pull movements, arm and/or leg controls, could never climb stairs or ladders and balance, could never bend or stoop and could occasionally reach. (*Id*). Dr. Floyd noted that Plaintiff could not work around hazardous machinery. (*Id*).

On the pain form, Dr. Floyd found that plaintiff's pain was intractable and virtually incapacitating both with exertion and without exertion. (R. 266). Dr. Floyd stated that plaintiff has a medical condition consistent with the pain she experiences

and that the side effects of her prescribed medication were such that she will be totally restricted and unable to function at a productive level of work. (R. 267).

The ALJ denied disability benefits to plaintiff concluding that plaintiff was capable of sedentary work with an residual functional capacity (RFC) to include lifting and carrying 10 pounds frequently; standing and walking two hours in an eight hour day; sitting for six hours; only occasionally balance, stoop, kneel, crouch, or crawl; no exposure to concentrated extreme cold or vibration; inability to climb ladders, ropes, or scaffolds; and no work around hazardous machinery or at unprotected heights. (R. 24).

## Standard of Review

In a Social Security case, the initial burden of establishing disability is on the claimant, who must prove that due to a mental or physical impairment he is unable to perform his previous work. *See Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). If the claimant is successful, the burden shifts to the Commissioner to prove that the claimant can perform some other type of work existing in the national economy. *See id.*

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. *See* 42 U.S.C. §

405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996); *Bloodsworth*, 703 F.2d at 1239.

This court also must be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *See Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987); *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). No presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *See Brown v. Sullivan*, 921 F.2d 1233, 1235-36 (11th Cir. 1991); *Corneliuis v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991). Furthermore, the Commissioner's "failure to . . . provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius*, 936 F.2d at 1145–46. When making a disability determination, the Commissioner must, absent good cause to the contrary, accord substantial or considerable weight to the treating physician's opinion. *See Lamb v. Bowen*, 847 F.2d

698, 703 (11th Cir.1988); *Walker*, 826 F.2d at 1000.

## Legal Analysis

The law requires the ALJ to evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) ("an ALJ must make specific and well-articulated findings *as to the effect of the combination of impairments* when determining whether an individual is disabled") (emphasis added). Accordingly, the ALJ must make it clear to the reviewing court that he has considered all alleged impairments, both individually *and in combination*, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See Davis*, 985 F.2d at 534.

The ALJ did not do this here. The ALJ found that plaintiff had the severe impairments of status post torn foot ligament, chronic pain, and depression. (R. 23). The ALJ did not consider chronic migraines (R. 203, 206, 207-209, 211), uncontrolled diabetes (R. 211), or malignant hypertension (R. 296). The medical evidence clearly reflects plaintiff suffering from migraines on a daily basis. (*Id.*); *see also Thompson v. Barnhart*, 493 F.Supp.2d 1206, 1215 (S.D.Ala.2007) (noting that "neither the SSA nor the federal courts require that an impairment, including migraines, be proven through objective clinical findings"); *Ortega v. Chater,* 933 F. Supp. 1071, 1075

9

(S.D.Fla.1996) (finding that, because "present-day laboratory tests cannot prove the existence of migraine headaches," objective clinical evidence of the symptoms of migraines can suffice as proof).

The medical evidence also indicates that plaintiff has blood sugar ranges from 225 - 433 and cannot afford diabetes test strips. (R. 205, 207, 208, 209, & 211). *See* 20 C.F.R. § 404 app. 1 Listing 9.00 (discussing diabetes mellitus). The court has no means by which to determine whether the ALJ complied with the requirement to consider all impairments or the combination of impairments, as his opinion is devoid of any such findings. A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly. *See Vega v. Comm'r*, 265 F.3d 1214, 1219 (11th Cir. 2001).

The ALJ also afforded no weight to the opinion of Dr. James Floyd. (R. 25). Dr. Floyd indicated that plaintiff is only able to sit for three hours in a workday and is able to stand for less than one. Dr. Floyd further finds that plaintiff experiences incapacitating pain. The ALJ has not offered the opinion of another physician or medical evidence to support the discard of Dr. Floyd's opinion. In fact, the opinion of Dr. Hasan, the DDS consultative examiner, supports Dr. Floyd's opinion by finding that plaintiff can stand for less than one hour, can sit for 6-8 hours, and was unable to perform tandem gain, toe walk, or heal walk. (R. 235-238). In addition, the ALJ makes

no mention of Dr. Jon G. Rogers' assessment of plaintiff in which he assigned her a Global Assessment of Functioning (GAF) score of 55. (R. 231). A GAF of 55 is indicative of difficulty in social, occupational, or school functioning. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS IV-TR 35 (2000).

"As the hearing officer, [the ALJ] may not arbitrarily substitute his own hunch or intuition for that of a medical professional." *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992). (Johnson, J. concurring) The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). The ALJ is required, however, to state with particularity the weight he gives to different medical opinions and the reasons why. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

> Absent "good cause," an ALJ is to give the medical opinions of treating physicians substantial or considerable weight. Good cause exists "when the: (1) treating physician's opinion was not bolstered by evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." With good cause, an ALJ may disregard a treating physician's opinion, but he "must clearly articulate [the] reasons" for doing so.

*Winschel v. Comm'r*, 631 F.3d 1176, 1179 (11th Cir. 2011) (internal citations omitted). In short, "good cause" exists if the opinion is wholly conclusory, unsupported by the objective medical evidence in the record, inconsistent within itself, or appears to be based primarily on the patient's subjective complaints. *Edwards v. Sullivan*, 937 F.2d

580, 583 (11th Cir. 1991); *see also Crawford v. Comm'r*, 363 F.3d 1155, 1159 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

The ALJ here did not have good cause for disregarding the treating physicians' opinions. No medical evidence contradicts the physicians' conclusions, and none of them opined that plaintiff was malingering. Rather, the medical records demonstrate that each of plaintiff's treating physicians took her complaints seriously and have tried various treatments for plaintiff's symptoms. In light of these considerations, the court finds the record devoid of substantial evidence to support the decision of the ALJ. The Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal." *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-1146 (11th Cir. 1991). Before the court in this case are multiple medical opinions concerning the nature, origins, and severity of plaintiff's disability due to numerous mental and physical ailments from which the record demonstrates she has suffered. By inferring that plaintiff was able to work from his selective review of the evidence, the ALJ substituted his opinion for that of all of the medical reports in the file. These records support a conclusion that the plaintiff does have significant limitations. Therefore, the court will remand this case to the ALJ to consider properly the evidence in the record, including the effect of the combination of plaintiff's impairments on plaintiff's ability

to work, to obtain a further physical consultative evaluation if necessary, for proper application of the law, and any further development of the record deemed necessary for these purposes.

## CONCLUSION

Because the ALJ failed to evaluate all alleged impairments, both individually and in combination, the ALJ did not provide sufficient reasoning for determining that the proper legal analysis has been conducted. The ALJ's opinion is therefore against the weight of the evidence and the ALJ failed to apply the proper legal standards. Accordingly, the decision of the Commissioner is hereby **REVERSED** and **REMANDED** to the Commissioner for further evaluation of the record in accordance with this opinion.

**DONE** and **ORDERED** this 15th day of April 2013.

_____
INGE PRYTZ JOHNSON
SENIOR U.S. DISTRICT JUDGE